**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | |
| | : | Case No.: 7:19-CR-00042 (WLS-TQL-1) |
| | : | |
| FRANKIE SHEARRY, JR., | : | |
| | : | |
| Defendant. | : | |
| | : | |

## ORDER

Before the Court is Defendant Frankie Shearry, Jr.'s "Motion to Suppress Evidence." (Doc. 47.) For the reasons stated herein, Defendant's Motion is **DENIED**.

## PROCEDURAL BACKGROUND

On August 15, 2019, Defendant Shearry was charged by indictment with one count of Possession of a Firearm by a Convicted Felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). (Doc. 1.) He was arrested on October 21, 2019. Shearry was arraigned on October 22, 2019 before Judge Thomas Q. Langstaff, who initially ordered that Shearry be detained pending trial. (Doc. 15.) At the arraignment, Shearry entered a plea of "not guilty." (Doc. 14.) A detention hearing was held on January 30, 2020 and the Court ordered that Defendant Shearry remain in custody pending trial after considering the information presented. (Doc. 30.) Defendant filed the instant motion, which includes a request for an evidentiary hearing, on the same day. (Doc. 47.) In his motion, Defendant asks that "any and all evidence seized from the warrantless search of [his] home on November 15, 2018" be suppressed. (*Id.*) The Court held an evidentiary hearing on the instant motion on December 8, 2020. (Doc. 56, 57.)

## FACTUAL FINDINGS

At the December 8, 2020 hearing on Defendant's Motion to Suppress, the Government presented one witness, Raven Aton, who was Defendant Shearry's Probation Officer on November 15, 2018. (Doc. 56.) The Government also presented three exhibits that were admitted without objection. (*Id.*) The Court apprised Defendant Shearry of his right to testify and put on evidence before the Court. (Doc. 59 at 48-49.) Defendant Shearry confirmed that he had discussed his options with his counsel and declined to testify. (*Id.* at 50.) Defendant

Shearry did not present any witnesses or evidence at the hearing. (*Id.*) Upon reviewing the exhibits, witness's testimony, and Parties' arguments, the Court makes the following findings of fact.

In October and November 2018, Defendant Shearry was on probation and under the supervision of the Georgia Department of Community Supervision ("DCS"). He was serving probation for the remainder of a felony sentence for possession of cocaine with intent to distribute issued by the Superior Court of Lowndes County Georgia. (Doc 57-1.) Defendant Shearry's probation was subject to a waiver of his Fourth Amendment rights, which stated that he would "allow, permit and consent" for his Probation Officer or law enforcement officer to search his person, vehicle, or residence without a search warrant and without probable cause. (*Id.*)  His supervising DCS officer, Raven Aton, made regular visits to both Shearry's home and place of work. During her supervision of Defendant Shearry, Officer Aton received an anonymous, unsigned fax regarding Shearry. The fax stated that the author had known Shearry for "about 1 year and some months" and that the author felt Shearry was a "bad influence" on "one of my homegirls" with whom Shearry was living. The faxed letter further stated that Shearry was using drugs and alcohol regularly, that Shearry drove while under the influence, and that Shearry "takes some type of pill" to help him pass drug tests. The fax concluded by stating that the author needed probation to "get him off the streets before he ruins my friends (*sic*) life."

Following the receipt of the anonymous fax, Officer Aton sought to follow up and check in with Defendant Shearry. She contacted the Lowndes County Sherriff's Office ("LCSO") for assistance in visiting Shearry, but the LCSO was unable to assist her due to case load. Officer Aton opted to conduct her regular home visits with Shearry. Some time after receiving the anonymous fax in October 2018,[1] Officer Aton conducted a regular home visit to Shearry's residence, and no one was home. When she was standing outside the front door, she smelled the odor of marijuana. In November of 2018, the LCSO began preparation for its annual "round-up," a multi-agency operation that employs officers from the LCSO, probation, the city, GBI, and federal agencies to conduct visits with offenders, probationers, or parolees that may require more than one officer to be present. Officer Aton coordinated with the LCSO

---

[1] At the hearing, Officer Aton testified to these facts. She stated also that she no longer works for the state probation office and therefore could not access her notes to get exact dates and other specific information for her testimony.

to add Defendant Shearry's name to the list for a search based on the receipt of the anonymous letter and her observation of the odor of marijuana outside his front door. Officer Aton added Shearry to this list because she did not want to conduct the search alone as officer smaller in stature.

Officer Aton and other members of law enforcement arrived near Defendant Shearry's residence on November 15, 2018. At approximately 6:30am, Officer Aton approached Shearry's residence by herself by knocking on the garage door. Defendant Shearry opened the garage door and spoke with Officer Aton, who explained to him that he had been selected for a search. Officer Aton specifically asked Shearry if he had any issues with a search, to which he said he did not. Defendant Shearry then proceeded back into his residence along with Officer Aton, who stayed with Shearry as he informed his wife of the impending search. Officer Aton waited for Defendant Shearry's wife to get dressed before confirming whether Shearry had any objections to the search. She then allowed officers to proceed with the search.

During the search of Defendant Shearry's bedroom, Officer Aton located a Jimenez Arms, Inc., .380 caliber semi-automatic pistol in the top drawer of a dresser. Another officer located a Bryco Arms, .380 caliber semi-automatic pistol under the mattress near the head of the bed. Officers also located a clear plastic bag with several green pills crushed to power, which field tested as MDMA/ecstasy in another dresser as well as marijuana, a grinder, smoking pipe, and digital scale.

FBI officer Jason Adams spoke with Defendant Shearry after the discovery of the contraband. Shearry agreed to speak with Adams after being read his rights under *Miranda*, which he waived. Defendant Shearry confirmed that he had two firearms in his possession and stated that he knew he was prohibited from having them but needed them for protection. Shearry also confirmed to the presence of marijuana and "ex" (ecstasy) in his residence.

On August 15, 2019, Defendant was charged in a one-count indictment for possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1), 924(e). Shearry now seeks to suppress all evidence that was seized from the allegedly warrantless search of his home on November 15, 2018. (Doc. 47 at 1.)

## DISCUSSION

In his Motion, Defendant Shearry seeks to suppress the "any and all" evidence search of his residence, including two handguns, which he contends were found only due to illegal

search and seizure. The Fourth Amendment of the Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. As the movant, Defendant "bears the burdens of proof and persuasion" that his Fourth Amendment Rights have been violated. *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998).

## I.  Standing to Contest the Search and Seizure

"The Supreme Court 'uniformly has held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a justifiable, a reasonable, or a legitimate expectation of privacy that has been invaded by government action.'" *United States v. Jones*, 184 Fed. App'x 943, 947 (11th Cir. 2006) (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979). Thus, a person may only challenge a search or seizure under the Fourth Amendment if he has standing to contest the search, meaning that he has a legitimate expectation of privacy in the area searched that society would recognize as reasonable. *Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967)); *Cooper*, 133 F.3d at 1398. To bring a successful challenge to suppress evidence under the Fourth Amendment, the moving party must be able to establish such an expectation of privacy as to demonstrate a "cognizable interest" in the property being searched. *Id.*; *see Byrd v. United States*, 138 S.Ct. 1518, 1530 (2018); *U.S. v. McBean*, 861 F.2d 1570, 1573 (11th Cir. 1988) (citing *United States v. Hawkins*, 681 F.2d 1343, 1344 (11th Cir. 1982) (cert. denied) ("[T]he proper analysis proceeds directly to the substance of a defendant's Fourth Amendment claim to determine whether the defendant had a reasonable and legitimate expectation of privacy in the article at the time of the search.").

A court must consider the totality of the circumstances in determining whether a person has standing to challenge a search or seizure. *McKennon*, 814 F.2d 1539, 1543 (11th Cir. 1987) ("Whether an individual possesses a constitutionally protected privacy interest depends upon the totality of circumstances.") (citations omitted).  Unlike a case where the defendant has disclaimed the property at issue, Defendant Shearry has only confirmed that the property searched was his residence. The residence was the address provided to his probation officer and the address Officer Aton had visited for follow-up visits with Shearry. Absent any evidence of disclaimer, it is clear that the property was Shearry's residence. Therefore, he maintained a subjective expectation of preivacy in the residence and the property is one in

which "society is prepared to recognize" his expectation was objectionably reasonable. *See United States v. Miravalles*, 280 F.3d 1238, 1331 (11th Cir. 2002).

Accordingly, the Court finds that Defendant Shearry does have standing to challenge the search and seizure that took place on November 15, 2018 under the totality of the circumstances as shown by the evidence presented.

## II.    Exception to the Search Requirement and Reasonable Suspicion

As previously noted, the Fourth Amendment to the United States' Constitution guarantees the right to be free from unreasonable searches and seizures of one's person, residence absent a warrant supported by probable cause. U.S. Const. amend. IV. There is no question that the Fourth Amendment's protections against unreasonable searches applies to those on probation. *United States v. Wasser*, 586 Fed. App'x 501, 504 (11th Cir. 2014) (citing *Owens v. Kelley*, 681 F.2d 1362, 1367 (11th Cir. 1982)). However, a probationer's rights and expectations of privacy are diminished and may be "subject to limitations to which ordinary citizens are free." *Id.* Such is especially true where a probationer is subject to special conditions of probation, like a Defendant Shearry.[2] *United States v. Knights*, 534 U.S. 112, 119-20 (2001) (stating that a probation order containing a waiver for the warrant and probable cause requirement further diminishes a probationer's expectations of privacy.). These limitations are permissible because the state maintains a compelling interest in limiting the liberties of those who have committed crimes in order to effectuate rehabilitation and protect its citizenry. *Owens v. Kelley*, 681 F.2d 1362, 1367 (11th Cir. 1982.)

The Supreme Court held in *United States v. Knights* that "[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." 534 U.S. at 121. In other words, to engage in a warrantless search of a probationer's residence pursuant to a special condition waiving the warrant and probable cause requirement, a probation officer merely needs to have

---

[2] In addition to conditions to probation, an exception to the search warrant requirement exists where a situation presents "special needs" that make the disposition of the warrant and probable cause requirement "impracticable." *Griffin v. Washington*, 483 U.S. 868, 873-74 (1987) (citations omitted). In such instances, only reasonable suspicion is needed to engage in a search. *See id.* A state probation system falls into the category of "special needs." *Id.* Therefore, law enforcement may conduct a search of the residence of a defendant on probation without a warrant with reasonable suspicion and authorization per the defendant's terms of probation. *United States v. Knights*, 534 U.S. 112, 119 (2001).

reasonable suspicion. *Id.* Reasonable suspicion exists where there is a high probability of criminal conduct such that an intrusion into the probationer's privacy is merited. *Id.*

In determining whether an officer had reasonable suspicion for such an intrusion, courts must evaluate the totality of the circumstances to see if a particularized and objective basis for suspecting legal wrongdoing existed. *United States v. Yuknavich*, 419 F.3d 1302, 1311 (11th Cir. 2005.)  Law enforcement must be able to point to specific and articulable facts and cannot rely upon mere suspicion or a hunch to show reasonable suspicion. *Id.* An "inchoate and unparticularized suspicion or hunch of criminal activity is not enough to satisfy the minimum level of objectivity required." *Id.* Thus, this Court must consider the totality of the circumstances in assessing whether Officer Aton has a particularized basis for suspected wrongdoing on Shearry's part and whether that suspicion was reasonable.

Defendant Shearry was on probation pursuant to conditions set by the Superior Court of Lowndes County, Georgia, which is within this Court's district. (Doc. 57-1.) In addition to the standard conditions of probation, Shearry was required to comply with certain special conditions, including a Fourth Amendment waiver listed at paragraph 11 of his disposition from the Superior Court. Special condition 11 states that to avoid the revocation or suspension of his probation, Shearry must

> "[a]llow, permit, and consent for Probation Officer or any law enforcement officed to search his person, vehicle and premises he occupies at anytime without a search warrant and without probable cause, and not object to any items seized during any search being admitted into evidence during any court trial, hearing, or proceeding."

(*Id.* at ¶ 11.)

Here, because of Shearry's status as a probationer, law enforcement only needed reasonable suspicion to engage in the search.[3] *Knights*, 534 U.S. at 119. The evidence and record demonstrate to the Court that law enforcement did have reasonable suspicion that criminal

---

[3] The Eleventh Circuit has held that the reasonable suspicion standard extends to searches of probationer's residences even where the probationer is not subject to a special condition waiving the requirement for warrants and probable cause. *See United States v. Yuknavich*, 419 F.3d 1302, 1309-11 (11th Cir. 2005); *see also United States v. Gomes*, 279 Fed App'x 861, 870 (11th Cir. 2008). Neither the Government nor Defendant Shearry challenge or question the existence or validity of the special condition of his probation. Regardless of any challenge, existent or nonexistent, law enforcement would only have needed reasonable suspicion under the same standard to properly engage in a search of Shearry's residence based on his status as a probationer based on Eleventh Circuit precedent. *See id.*

activity was occurring in the residence and therefore the search conducted was not illegal. Reasonable suspicion was based on two key factors: 1) the anonymous letter that was faxed to the probation office and 2) the noticeable odor of marijuana coming from Shearry's residence in October as observed directly by Officer Aton. The Court shall address each of these factors in turn.

### A.  The Faxed Letter

Defendant Shearry's Probation Officer, Raven Aton, received the anonymous fax in 2018 per her testimony. (Doc. 59 at 10.) The fax itself was addressed to Defendant Shearry's "Parole/Probation Officer" and gave information indicating that Defendant Shearry was using drugs and manipulating his drug tests. (Doc. 66 at 2-3.) After receiving the faxed letter, Officer Aton scanned it into computer system for future reference and contacted the Sheriff's Office for support to visit Shearry's house to conduct a visit. (Docs. 59 at 11; 66 at 4.) The letter, in pertinent part, stated that Defendant Shearry was using drugs and alcohol, drinking and driving, using a substance to mask drugs in his urine-based drug tests, and partying "all the time." (Doc. 57-2.) It is also significant that the author stated they had known Defendant Shearry for "about 1 year and some months" and that Shearry's conduct in effect threatened to ruin the author's friend's life. (*Id.*) The faxed letter further described specific illegal conduct concerning Shearry's conditions of probation: 1) the use of drugs and alcohol and 2) the possibility that he was tampering with or thwarting his drug tests. A fair reading of the faxed letter, though anonymous, supports an inference of personal knowledge on the part of the writer. The question is whether the grounds raised in the letter satisfy the reasonable suspicion standard.

"'To have reasonable suspicion based on an anonymous tip, the tip must be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.' The issue is whether the tip, as corroborated by independent police work, exhibited sufficient indicia of reliability to provide reasonable suspicion." *United States v. Riley*, 706 Fed. App'x 956, 961 (11th Cir. 2017) (quoting *United States v. Lindsey*, 482 F.3d 1285, 1291 (11th Cir. 2007) (quotation omitted)). Upon receiving the faxed letter, Officer Aton had to consider the fact that Shearry was on probation for a prior drug-related charge and that the conditions of his probation prohibited him from the use of any drugs or alcohol. The faxed letter, at a minimum, gave Officer Aton reasonable suspicion to suspect that Shearry was engaging in criminal behavior,

as it gave active indicators that he was using illegal substances and violating the conditions of his probation. Considering these factors in conjunction with Officer Aton's personal knowledge of Shearry's history, there was a basis to conduct a search based on reasonable suspicion. *See Yuknavich*, 419 F.3d at 1311.

Defendant contends that the faxed letter is of no consequence, however, on the grounds that it was "stale" by the time the search was conducted on November 15, 2018. (Doc. 66 at 10.) In briefing and at the hearing, Defendant focused on the fact that date as printed by the fax machine on the faxed letter's paper is September 13, 2017. Officer Aton testified that the date on the machine was incorrect based on her experience with the fax machine. (Doc. 59 at 40-41.) However, Officer Aton explained that she recalled that the faxed letter came to her office in October 2018, a few weeks before the "round-up" and search. (*Id.* at 41.)

"[W]hen considering the staleness of information, we must consider whether the crime is ongoing or isolated." *United States v. Carter*, 566 F.3d 970, 975 (11th Cir. 2009) (citing *United States v. Bervaldi*, 226 F.3d 1256, 1265 (11th Cir. 2000)). The Court also views the available evidence with the knowledge that the timeframe for when information becomes stale varies from case to case based on the specific facts and issues presented. *See United States v. Touset*, 890 F.3d 3d 1227, 1238 (11th Cir. 2018) (citing *United States v. Bervaldi*, 226 F.3d 1256, 1265 (11th Cir. 2000)). In light of the testimony and evidence presented here, the Court finds that the faxed letter was not stale. Though the fax machine printed a date on the paper that differed from the time period recalled by Officer Aton, the Court finds Officer Aton's testimony much more compelling. The tone and content of the letter itself reads from a place of immediacy and personal knowledge, which indicates that whatever the author was witness was current and ongoing. The passage of a few weeks between the letters receipt and the search is hardly enough time for its content to fade from memory. Further, Defendant only presents mere conjecture to counter Officer Aton's testimony that the letter was received in October before the November search. Thus, the Court finds that the faxed letter was not stale and served as a viable catalyst for the development of reasonable suspicion to search.

B. *The Odor of Marijuana*

After receiving the faxed letter, Officer Aton attempted to visit Defendant Shearry despite the lack of Sheriff assistance. (*Id.* at 11-12.) When she attempted the visit, Defendant

Shearry was not home. (*Id.* at 12.) During that visit, Officer Aton smelled a strong odor of marijuana coming from Shearry's closed, locked front door. (*Id.*) It is well-established that the smell of marijuana gives an officer cause to search. *See United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991) (en banc) ("There is no doubt that the agent's suspicions rose to the level of probable cause when . . . he detected what he knew from his law enforcement experience to be the odor of marijuana."); *United States v. Lueck*, 678 F.2d 895, 903 (11th Cir. 1982) ("At the point marijuana was smelled by [the officer], probable cause to believe a crime had been committed . . . arose."). Therefore, Officer Aton was well within her right to investigate further based on her observation of the odor of marijuana. As Shearry's Probation Officer, Officer Aton had personal knowledge of Shearry's criminal history and previous drug charges and a professional relationship with him. Given her supervisory role, the odor of marijuana undoubtedly raised suspicion that drugs were in use on the premises and that Shearry may have thus been violating the terms of his probation. *See United States v. Pendergrass*, No. 1:17-CR-315-LMM-JKL, 2018 WL 7283631, at *10 (N.D. Ga., Sept. 11, 2018) (stating that the odor of marijuana at a probationer's residence gave probation officers reasonable suspicion that the probationer may have been using drugs in violation of the conditions of his probation.) Given the totality of the circumstances based on the faxed letter, Officer Aton's observations thereafter, and Defendant's history, the Court finds that there was a reasonable suspicion that there was a high probability that criminal conduct was occurring at Shearry's residence.

### III.   Consent for the Search

Aside from any reasonable suspicion on the part of law enforcement, officers may also enter a home based on other exigent circumstances, including consent. *United States v. Harris*, 928 F.2d 1113, 1117 (11th Cir. 1991) ("A search conducted pursuant to consent is a recognized exception to the requirements of probable cause and a search warrant.") Here, the Government argues that the officers lawfully entered Defendant Shearry's residence based on his consent when he opened the door and first spoke to Officer Aton, allowed the officers to enter, did not object to anything the officers did, did not ask for a warrant, did not ask the officers to leave, offered consent to the search a second time, and allowed the search to take place without interference. (Docs. 49, 71.) Ultimately, Shearry's offer of consent rendered the need of reasonable suspicion needless.

Defendant Shearry contends that he did not offer valid consent to the search. (Docs. 47, 66.) Rather, Shearry asserts that "any consent obtained from [him] was the product of fear and coercion rather than free will." (Doc. 66 at 13.)

Courts should determine whether a defendant voluntarily consented to officers entering his residence based on a number of factors, including: whether the defendant was "free to leave, whether there was coercive police procedure, the extent of the defendant's cooperation or awareness of a right to refuse to consent, whether the defendant could refuse to consent, the extent of the defendant's education and intelligence, and the defendant's belief that no incriminating evidence would be found." *United States v. Ramirez-Chilel*, 289 F.3d 744, 752 (11th Cir. 2002) (citation omitted) (cleaned up).

Defendant Shearry argues that his responses were given based on law enforcement's show of authority due to the fact that there were "more than 8" uniformed officers present on the street near his residence that morning because of the LCSO "round-up."[4] (Doc. 66 at 15.) Shearry contends that any implied consent should be construed as involuntary, as it could not reasonably be viewed as consensual given the presence of law enforcement and show of official authority. Further, Shearry argues that the procedures employed were coercive and that the circumstances did not afford Shearry the knowledge or opportunity to refuse to consent.

However, based on the body-worn camera footage, testimony at the hearing, and record, the Court finds that Defendant Shearry provided valid consent for the search of his residence on November 15, 2018. Despite Defendant's contention that there was an overwhelming officer presence, the footage from Officer Aton's body-worn camera taken on November 15, 2018 shows that upon arrival at Shearry's residence, Officer Aton[5] approached

---

[4] During the hearing, Officer Aton was questioned on direct and cross examinations about the nature of the LCSO "round-up" and why the search of Defendant Shearry's residence was conducted in conjunction with the event. In testimony, she explained that the purpose of the round-up was for officers to conduct visits with offenders, probationers, or parolees that may require more than one officer to be present. She also noted that the round-up was primarily aimed at supervisees that were known to be gang-affiliated. (Doc. 59 at 25.) Officer Aton also specifically stated that there were other reasons supervisees were included on the list for the round-up, including the need for additional officer support. (*Id.*) She explained that because she had been unable to arrange for LCSO assistance to contact Shearry prior to the round-up, she added his name to the list due to the more secluded nature of his residence and her smaller stature. (*Id* at 25-26.) Thus, the Court finds that the evidence and testimony make clear that Defendant Shearry was not the object of the gang-related searches or a gang-focused police operation. Officer Aton was the officer conducting the search based on her supervision of Shearry with the aid of the LCSO.

[5] The body-worn camera footage showed that Officer Aton did not approach Shearry's residence with the law enforcement team. She walked up to the house and first engaged with Shearry alone. After speaking with Shearry and obtaining his verbal consent to the search, she proceeded into the residence. However, she was

the garage door and announced her presence on her own. (Doc. 71 at 3.) Defendant Shearry then came out of his residence and spoke directly with her. (*Id.*) She spoke to Shearry directly and calmly. Officer Aton explained why she was there, what was about to take place, and specifically asked Shearry whether he had any issues with her searching the residence, to which he stated he did not.[6] (*Id.* at 4.) The footage also shows that Shearry walked with Officer Aton into his residence, allowing her and at least one more officer to enter without objection. After explaining the situation to his wife, Officer Aton again confirmed with Shearry that he did not have any objections to the search. He indicated he did not. (Doc. 59 at 32-33.)

Defendant Shearry was given multiple opportunities to deny entry to his residence or object to the search. Based on his status as a probationer and his previous meetings with Officer Aton, he was aware that he maintained the right to object to the search. (Doc. 59 at 30, 31, 33.) He also knew the possibility of a search yielding contraband. In addition to his direct consent given to Officer Aton, it also appears that Shearry "demonstrated his consent to entry by 'yielding the right-of-way' for the officers to enter." *Ramirez-Chilel*, 289 F.3d at 751-52. Defendant Shearry did more than merely "fail[] to object;"[7] he engaged in conversation with Officer Aton as the two of them walked into the house together and after. Under these circumstances, it appears that "the officers did receive some sort of implied consent to enter" along with direct consent to enter as given to Officer Aton. *Id.* At no point in the footage does Shearry appear to convey acquiescence only because of law enforcement's presence. In fact, contrary to the Defendant's argument in briefing, not all of the officers at the "round-up" were visible when Officer Aton first made contact with him on November 15, 2018.

At the hearing, Defendant Shearry did not produce any evidence or testimony to support his contention that he was ever in fear or was coerced by Officer Aton or any other officer that morning. (*See* Doc. 56 at 50.) Officer Aton testified that even though there were other officers present that morning, she was the one who stepped out on her own to make contact with Shearry because, as his Probation Officer, she knew she needed to "ask for

---

beside and speaking with Shearry during the events. When Officer Aton entered the residence, the law enforcement team followed, but did not engage in the search until Aton stated to begin. At no point does the footage show any demonstrations of force.

[6] Officer Aton:  *Do you have any issues with me searching the residence?*
  Shearry:  *Naw.*
Exhibit 2, minute 6:19-6:27

[7] *Gonzalez*, 71 F.3d at 829-30 (explaining that failure to object is not sufficient to infer consent).

permission to enter his residence to search his home." (Doc. 59 at 16.) Moreover, Officer Aton testified that Defendant Shearry was informed of his rights, including his right to refuse entry into his home, on his first day under her supervision. (*Id.* at 30-31.) Defendant did not challenge this assertion or offer any argument stating he was not aware of his right to refuse entry or that he had not been so advised in briefing or at the hearing.

Considering these facts and factors in the totality of the circumstances, the Court finds that Defendant Shearry indeed voluntarily consented to the search of his residence. Therefore, the motion to suppress should be denied.

## <u>CONCLUSION</u>

The Court finds that Defendant Shearry validly and voluntarily consented to the search of his residence on November 15, 2018. Regardless of this consent, the Court also finds that law enforcement maintained reasonable suspicion to conduct a search of the residence based on the factors described herein. (*See* Section II, *supra*.) Accordingly, for the foregoing reasons based upon the totality of the circumstances as shown by the evidence presented, Defendant Shearry's "Motion to Suppress Evidence" (Doc. 47) is **DENIED**

**SO ORDERED**, this <u>25th</u> day of October 2021.

/s/ W. Louis Sands
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**